Hermine RAUSNITZ

v.

PHILADELPHIA TRANSPORTATION COMPANY.

Civ. A. No. 21048.

United States District Court
E. D. Pennsylvania.

March 26, 1958.

---

2. See unpublished opinion of trial judge attached to plaintiff's brief.

Elwood S. Levy, Philadelphia, Pa., for plaintiff.

H. Francis DeLone, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is before the court on defendant's post-trial motions in an action for personal injuries alleged to have been caused on October 25, 1955, by defendant's failure to exercise the highest degree of care, vigilance and safety in discharging a passenger safely at a bus stop. Neither party has arranged to have the notes of testimony transcribed, so that the testimony must be considered on the basis of the trial judge's memory, as refreshed by handwritten notes taken during the trial.

The plaintiff testified that when her right foot was on the street and her left foot on the bottom step of the bus, the driver closed the double doors, pushing her left foot outward and catching her coat in the door. The bus moved forward quickly, ripping her coat, and the side of the bus (a few feet behind the front door) struck her back. These two forces (the pull of her coat and the striking of her back) threw her to the ground.

Mrs. Pace (the only other witness for the plaintiff who saw the accident) testified that the rear of the bus was nearer the curb than its front was and the front wheels of the bus turned so that it pulled away straight (parallel to the curb), thereby causing its side to hit plaintiff. The bus pulled away "fast" so that plaintiff did not have an opportunity to even take one step before the bus started.

Defendant contends that because Mrs. Pace testified that the side of the bus, approximately midway between its

front and rear, hit her (see "Y" on D–3)[1] and because, when asked to mark the place where plaintiff fell, she made a large "Y" on a picture (P–2) at a location several feet north of an "X" placed on P–2 by her to mark the position of the doors when the bus stopped, "plaintiff must have walked some distance north alongside and toward the rear of the bus before she was struck."[2] Since Mrs. Pace testified that the bus started up "fast" and before plaintiff had had an opportunity to take one step, the center of the side of the bus could have hit her before she had had an opportunity to move at all, particularly as she was faced with the problem of getting her coat from the doors. Both the "X" and the "Y" made on P–2 cover such a large area that they furnish no evidence of any more than that the plaintiff fell at a point north of the spot where the bus door was when she alighted. Evidence that plaintiff fell to the north of the door, rather than to the south, is not necessarily inconsistent with plaintiff's story of being thrown to the ground by the two forces described above. For this reason, the cases relied on by defendant[3] are inapplicable to this factual situation.[4]

■ Also, defendant complains of the trial judge's treatment of the following improper statements of plaintiff's counsel in his closing argument (pp. 29–30 of partial transcript):

"Now, members of the jury, it is no defense to the PTC that in their negligence they happened to select an elderly lady. They cannot limit

their carelessness to healthy athletes and say to people who have advanced in years and who have acquired the conditions that all of us have in advancing years, 'Because you are old we are not concerned. If we are careless, we will limit—' "

The trial judge stated, as soon as counsel for defendant objected, that this was not "fair comment" and that he would explain in what way such language might have been proper in his charge to the jury.[5] In the charge, the trial judge explained that the defendant takes an old person whom it injures as it finds her, that it is responsible for any aggravation by it of her pre-existing injuries, and that the jury "must consider the effect of these injuries on an old lady."[6] Also, the charge stated that plaintiff had to use the degree of care for her own safety that a reasonably prudent person of her age and physical condition should use and that her advanced years should also be considered in evaluating her perception and memory. The record does not indicate that the action of the trial judge in this matter justifies a new trial. See F.R. Civ.P. 61, 28 U.S.C.A.

■ Defendant rests its contention that the verdict is excessive on Dr. Joyce's 1956 reports that her recovery was excellent as of that time. However, Dr. Joyce testified that, as of the time of trial, plaintiff's limitation of motion and walking with a limp, together with pain incident to her physical condition producing those results, would not improve in the future. He also testified that, in

1. Mrs. Pace testified that the left part of the "Y" was the place where plaintiff fell. Mrs. Pace's statement points out that the bus "spun her around" before she fell (P–4).

2. Page 4 of defendant's brief.

3. Lemak v. City of Pittsburgh, 1941, 147 Pa.Super. 62, 65–66, 23 A.2d 354; Roche v. Pennsylvania Railroad Co., 1951, 169 Pa.Super. 48, 56, 82 A.2d 332, and cases cited in footnote at page 5 of defendant's brief.

4. The jury may not have accepted the testimony of defendant's witness, Mr. Turnock.

5. This language appears at page 30 of the partial transcript:
"Mr. DeLone: If Your Honor pleases, I object to that as improper argument.
"The Court: Just a minute.
"Mr. DeLone: I never made any such suggestion.
"The Court: The time is up, and I will comment in my charge. It is 53. You have had your full ten minutes.
"Mr. Levy: Your Honor, it is fair comment.
"The Court: I disagree with you. I think that a certain part of it was, but I will explain it to the jury."

6. Pages 12–13 of the charge.

his opinion, her present physical condition, as described in the preceding sentence, was caused by

(a) soft tissue injuries incurred at the time of the fractures of October 25, 1955, and prolonged immobilization caused by these fractures, making the ligaments inelastic; and

(b) the aggravating effect of the accident on her previous arthritis and arthrosis.

In view of this testimony, defendant's claim that the verdict is "grossly excessive" as far as the medical testimony is concerned is not valid.

However, defendant is entitled to a new trial unless plaintiff will agree to a remittitur of $5,500 because of an error in the charge permitting the jury to include in the damages recovery for loss of earnings for the period subsequent to 1956, without any direction to reduce such award to present worth, when there was no evidence in the record justifying such recovery. Plaintiff testified that prior to the accident she had done embroidery work at home for at least one knitting mill. Although there has been limitation of her leg motion since the accident, there was no testimony that she could not do embroidery work with her hands since she left the nursing home in June 1956. Exhibit P–10, which was sent out to the jury by agreement, shows that her average annual earnings for the five years prior to the accident were about $516. Mr. Zeffert (an actuary called by plaintiff) testified that she had a life expectancy of ten years from the date of the trial.[7] Immediately prior to the closing argument, the trial judge submitted to counsel for their comments a document entitled "Items of Damage On Which There Was Testimony As To Dollar Amounts" (C–3), which contained the following:

> "A. Out-of-pocket expenses:
> \* \* \* \* \* \*
>     Total       $4446.43
> "B. Loss of earnings, 9
>     months at $516.00 a
>     year       387.00"

As a result of objection by counsel for plaintiff to the limitation involved in the use of "9 months," rather than letting the jury "make a calculation of the period," B was deleted from this document (see Exhibit C–4) when it was sent out to the jury.[8]

---

7. In answer to a question by plaintiff's counsel, Dr. Joyce testified that there was no reason why the arthritis shown on the X-rays should shorten plaintiff's life expectancy.

8. Pages 2–4 of the partial transcript, filed 1/16/58, include the following:
   "Mr. Levy: The only comment I have, sir, is that the entry under B, loss of earnings, 9 months at $516.00 a year.
   "The Court: Yes.
   "Mr. Levy: The jury can find that she lost earnings for a longer period than that, and I am referring at the moment, for example, for past earnings. I do not think Your Honor ought to make a calculation of the period for which Your Honor considers she lost earnings. I think that is for the jury. They may well find that it is only 9 months.
   "The Court: Yes.
   "Mr. Levy: But this would be a direction to find 9 months, in effect.
   "The Court: No. I will explain that to them, if you can remember any testimony on it. I just do not remember any testimony that supports the loss for longer than that.
   "Mr. Levy: I still think the jury has a right to draw certain inferences from whatever evidence there was, and I do not think Your Honor should indicate to the jury that the loss was 9 months, 11 months, or 4 months.
      \*     \*     \*     \*     \*
   "I would have thought as to the lost earnings that a notation that her average earnings per annum for the 5-year period preceding the accident was $518, and then leave it to them to determine what she lost.
   "The Court: All right. Average earnings were $518 for the 5 years preceding the accident. Do you agree to that?
   "Mr. DeLone: No, I do not agree with that, \* \* \*. I do not think any figure should go to the jury other than as you have it here, if you are going to do it at all, because there is no testimony to warrant any further consideration of loss of earnings beyond the time she got out of the hospital.

Plaintiff's counsel, in his argument to the jury, asked for inclusion in the damages of compensation for lost wages and also referred to the plaintiff's ten-year life expectancy (pp. 23 and 24 of partial transcript filed 2/12/58). The trial judge in his charge read a sentence from plaintiff's points for charge, directing the jury to "add such sum as will compensate her for such loss of earnings as you find she has sustained" and, after discussing earnings for the nine months the plaintiff was in the hospital and nursing home, continued "As to the future, whether or not she could have done her embroidery work in the future and up to the date of trial, I do not know." [9]

After consideration of the record, the trial judge has concluded that he was in error in using the last quoted language which permitted the jury to find damages for loss of earnings for "the future," as well as "up to the date of trial," in view of the absence of any evidence that the plaintiff was incapacitated after 1956 from doing such work as a result of the accident. When counsel for defendant excepted to the court's charge on "loss of future earnings" as not being "warranted under the testimony" (page 52 of transcript),[10] counsel for plaintiff took the position that the trial judge "did not instruct them on future loss of earnings" (page 53 of transcript), so that the trial judge did not supplement the charge to make this point clear.[11] The record makes clear that the trial judge's language did cover future loss of earnings, which was clearly error, and the jury may well have included in the damages an item of at least $5,500 for such loss (11 years at $500 per year).[12]

In the event that plaintiff, Hermine Rausnitz, does not file with the Clerk of this court, within thirty (30) days, a written agreement to the amendment of the judgment entered in her favor on December 16, 1957, to the amount of $19,446.43 ($24,946.43 minus $5,500), an order granting defendant's Motion for a New Trial (Document No. 19 in the Clerk's file) will be entered. If such a written agreement is filed within that time, an order will be entered denying defendant's Motion for a New Trial.

An order will be entered denying defendant's motion for the entry of judgment in its favor (Document No. 20 in Clerk's file).[13]

---

"The Court: I am not going to have any more argument on this, gentlemen. I will cut off the B. I will just leave the A, because there seems to be a difference of opinion between us as to the testimony."

9. The entire charge on this point appears at pp. 29–30 of the transcript of the charge.

10. Plaintiff's contention that defendant was bound to call this point to the trial judge's attention again after the supplement to the charge, which did not cover this subject, is rejected. Cf. F.R.Civ. P. 46 & 51; Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, 519. The cases relied on by plaintiff at pp. 27–30 of his brief are inapplicable to this factual situation. The trial judge made a confusing and erroneous statement in his charge and could not remember what he had said when asked to correct it, due to the conduct of plaintiff's counsel as described in footnote 11 below.

11. Since counsel for plaintiff had stated exceptions to the charge which cover 11 pages in the record (pp. 40–51 of transcript), the trial judge's memory of what he had said in the charge had become quite dim by the time counsel for defendant had an opportunity to mention this point.

12. Giving the plaintiff the benefit of every doubt, the jury might have been able to infer that the embroidery work could not have been resumed until she had become fully settled in her New York home, but there is no possible basis in the record for an inference that the accident prevented her from doing this work after December 27, 1956 (the date of a medical examination by Dr. Joyce—see his notes in folder marked Exhibit D–9), which was approximately 6 months after she arrived at her New York home.

13. The able briefs of counsel, as well as their letters dated February 17 and February 19, have been placed in the Clerk's file.